(Supreme Court, Special Term, New York County.   February, 1900.)

COSTS—RULING ON DEMURRER—EXTRA ALLOWANCE.

An extra allowance, authorized by Code, § 3253, of not over 5 per cent., on the sum recovered or claimed, in a difficult or extraordinary case, where a defense has been interposed, cannot be granted on the overruling of a demurrer with leave to answer on payment of costs, but only when final unconditional judgment is rendered.

Action by Mary Hackett against the Equitable Life Assurance Society.   Motion for extra allowance upon the overruling of a demurrer to the complaint.   Denied.

C. N. Morgan, for the motion.

W. B. Hornblower, opposed.

GILDERSLEEVE, J.   The defendant interposed a demurrer to the complaint, argument was had, and the demurrer was overruled, with leave to defendant to withdraw the same and answer on payment of costs.   The plaintiff makes a motion for an extra allowance.   The Code, in section 3253, provides for an extra allowance of not over 5 per cent. upon the sum recovered or claimed, or the value of the subject-matter involved, in a difficult and extraordinary case, where a defense has been interposed.   It has been held that a demurrer is a defense, within the meaning of the section, and that an additional allowance can be granted.   Railroad Co. v. Harold, 30 Hun, 466.   Also, see People v. Fitchburg R. Co., 133 N. Y. 239, 30 N. E. 1011; Moulton v. Beecher, 1 Abb. N. C. 245.   It is true that only one allowance can be given, although the case may be tried several times.   See Flynn v. Society, 18 Hun, 213.   An additional allowance, however, cannot be granted upon overruling or sustaining a demurrer, with leave to answer on payment of costs, but only when the final judgment is pronounced that unconditionally terminates the action, and fixes absolutely the right of the successful party to tax his costs under the Code. See De Stuckle v. Railroad Co., 30 Hun, 34 (Davis, P. J.)   The demurrer in the case at bar, as we have seen, was overruled, with leave to answer, and I do not see how an additional allowance can be granted.

Motion denied; no costs.

---

(48 App. Div. 147.)

### CENTRAL TRUST CO. OF NEW YORK v. WEST INDIA IMP. CO. et al.

(Supreme Court, Appellate Division, First Department.   February 16, 1900.)

1. MORTGAGES—AFTER-ACQUIRED PROPERTY—CONCESSIONS—GRANTS AND FRAN-
CHISES—CONSTRUCTION.

A promoter obtained an option to purchase a railroad from a foreign government, and concessions for extensions.   He organized a domestic corporation, to which he transferred all his rights and concessions under the agreement by which he was to receive £1,500,000 of first mortgage bonds of the company, £530,000 of which were to be withheld until the road was completed; and £1,030,000 of stock and £100,000 of second mort-

gage bonds, to be paid as each division of extension was completed, and the section of land for each mile thereof. The corporation to raise funds for the extensions executed a mortgage to plaintiff on all its franchises, concessions, and on other property, real and personal, rights, privileges, franchises, and liberties acquired by it, or thereafter to be acquired, and all tenements, hereditaments, and appurtenances thereto appertaining, and the rents, issues, emoluments, and profits thereof. *Held*, that the mortgage. covered the £1,030,000 of capital stock of the company and the £100,000 of second mortgage bonds, since the words "rents, issues, emoluments, and profits thereof" indicated not only an intention to include the grants and concessions deeded by the promoter to the corporation, but also the stock, bonds, and lands to be earned by it as it completed the extensions.

**2. SAME—ESTOPPEL—INTENTION OF PARTIES.**

Where a mortgage was executed on the grants, concessions, and franchises of the mortgagor to purchase a railroad belonging to a foreign government, and build extensions thereto, and by the agreement between the mortgagor and the government first mortgage bonds were to be issued by the company as extensions were built, to be used to complete the same, together with railway stock and second mortgage bonds, except that there was no provision authorizing the mortgagor to use such bonds for the extensions, the fact that the mortgagee allowed the mortgagor to use the first mortgage bonds to raise funds to build the extensions, and to retain possession of the second mortgage bonds and stock, and gave the company no notice of his rights under the mortgage other than recording it in the foreign country, was not sufficient to estop the mortgagee from objecting to the hypothecation of the second mortgage bonds and stock by the mortgagor.

**3. SAME—RAILWAYS—LAND—RAILROAD'S STOCK AND BONDS—CHATTELS—CHATTEL MORTGAGES—RECORDING.**

Where a mortgage was executed on securities issued by a railroad company operating a railway in a foreign country, consisting of second mortgage bonds, part of the corporate stock, and land, such securities are not chattels within the New York law requiring the filing of chattel mortgages in order to protect the mortgagee against subsequent purchasers.

**4 SAME—EQUITABLE TITLE—MORTGAGE ON AFTER-ACQUIRED STOCK—BONA FIDE PURCHASERS—LEGAL TITLE.**

Where defendant executed a mortgage on its grants, franchises, and rights to purchase a railway from a foreign government, under which £1,030,000 of stock and £100,000 of its second mortgage bonds were subsequently issued to defendant in accordance with the concessions previously granted which remained in the hands of the mortgagor, the mortgagee only obtained an equitable right to such securities, and hence was not entitled to enforce the same as against a bona fide pledgee thereof, who subsequently acquired the legal title thereto by an absolute deed from the mortgagor.

**5. CONSTRUCTIVE NOTICE TO AGENTS—NOTICE TO PRINCIPAL.**

Constructive notice to the attorney of a pledgee of securities, who subsequently obtained a legal title thereto from the pledgor, of equitable rights of another, was not constructive notice to the principal, so as to preclude him from being a bona fide purchaser for value.

**6. SAME—BILLS AND NOTES—BONA FIDE PURCHASERS.**

Creditors of a contractor, who accepted notes of an improvement company in consideration of an extension of time to the contractor on the original indebtedness, and others who received the notes in full settlement of the pre-existing debt of the contractor, were bona fide holders for value.

**7. SAME.**

Creditors to a contractor, who accepted notes of an improvement company, which were merely credited on the pre-existing debt of the contractor without extending the time of payment, and others who merely took the notes as collateral security, were not holders thereof for value.

8. MORTGAGES—EQUITABLE LIENS—ACTION TO VACATE—PARTIES—DISTRIBU-
TION.
    Where prior mortgagees sued to set aside a subsequent lien, and the
holder prayed that the rights of all persons claiming under such lien
be adjusted, and the property distributed, but all such holders were not
parties to the suit, the property could not be distributed, though such lien-
holder was adjudged entitled to the property.
    Ingraham, J., dissenting.

Appeal from judgment on report of referee.

Action by the Central Trust Company of New York against the
West India Improvement Company, the Manhattan Trust Company,
and others. From a judgment entered on the report of a referee dis-
missing the complaint, plaintiff appeals, and the West India Improve-
ment Company appeals from a judgment dismissing its cross com-
plaint against its co-defendant the Manhattan Trust Company, and
awarding such co-defendant an extra allowance of $2,000. Affirmed.

The opinion of the referee (WM. G. CHOATE) is as follows:

This action was commenced on the 8th of January, 1897, by the plaintiff,
the Central Trust Company of New York, trustee under a mortgage executed
to it by the defendant the West India Improvement Company, on the 1st day
of September, 1889, to secure an issue of $1,000,000, par value, of mortgage
bonds of the same date, payable on the 1st day of September, 1899, with inter-
est thereon at 4 per cent. per annum. The purpose of the action is to procure
an injunction restraining the defendant the Manhattan Trust Company from
making any sale, transfer, or disposition of certain shares and bonds of the
Jamaica Railway Company, a company organized under the laws of the British
Colony of Jamaica, which bonds and shares the defendant the West India
Improvement Company assigned, or attempted to assign, by a trust deed dated
the 3d day of September, 1896, to the Manhattan Trust Company as trustee,
to secure certain notes of the West India Improvement Company to an amount
of $1,000,000. The relief demanded in the complaint is that the plaintiff, as
trustee under said mortgage, be adjudged to have a lien upon said securities
prior and superior to any other lien or claim whatsoever for the benefit of
the holders of the bonds secured by the mortgage; that the attempted pledge
or hypothecation of said securities to the Manhattan Trust Company be de-
clared unlawful, and void, and in fraud of the rights of the plaintiff; that the
defendants be required to surrender and deliver to the plaintiff as trustee said
securities, so far as they are in possession of the defendants, and that the
defendants be enjoined from selling or disposing of the same, and for other
relief. The mortgage to the plaintiff and that to the defendant the Manhattan
Trust Company are set forth, and annexed to the complaint. The defendants
deny that the hypothecation of said securities to the Manhattan Trust Company
under the instrument executed on the 3d day of September, 1896, was unlaw-
ful, or in fraud of the plaintiff's rights, or the rights of the holders of the
bonds secured by the plaintiff's mortgage. The defendant the West India
Improvement Company also asks affirmative relief against the Manhattan
Trust Company and the note holders under its mortgage on the ground that the
said instrument of hypothecation to the Manhattan Trust Company was pro-
cured under an agreement made between the said defendant the West India
Improvement Company and one Calvin S. Brice, with the knowledge of the
Manhattan Trust Company and of all the parties who took said notes that the
said Brice would procure a loan of $1,000,000 for the West India Improvement
Company for one year, and that notes which were given under said instru-
ment of hypothecation for four months were, with the knowledge of said Man-
hattan Trust Company and said holders of the notes, a mere temporary expedi-
ent, to be replaced at the end of the four months by other securities or loans
to be obtained by the said Brice; that the said Brice has wholly failed to
carry out his said contract; and relief is asked that said mortgage and notes
be declared void, and said securities thereby hypothecated be surrendered.
All the parties holding said notes or claiming an interest in them have volun-

tarily come into the action as defendants except the Ætna Powder Company, the Rogers Locomotive Company, and Calvin S. Brice, and those coming in have joined in the answer of the Manhattan Trust Company to this alleged cause of action on the part of the West India Improvement Company, denying the allegations of the West India Improvement Company with respect to said contract of said Brice, and its breach, and the alleged knowledge of and participation in said alleged agreement with Brice, and claiming to be bona 'fide holders of said notes for value.

The circumstances that led up to the making of the plaintiff's mortgage, so far as they seem to be material; are as follows: On the 29th day of March, 1889, the government of Jamaica entered into a written agreement with one Frederick Wesson, of New York, for the purchase from the Jamaica government of a railroad already constructed in the island of Jamaica about 65 miles long, and for the construction of extensions of said railroad of about 120 miles. By the terms of this agreement, which was afterwards embodied in the form of a law passed by the legislative council of Jamaica, a corporation was to be formed under the laws of the colony of Jamaica, to be called the Jamaica Railway Company, to own and operate said railway and extensions; and said Wesson, within 12 months after the passing of the law, was to lodge in the treasury of Jamaica the sum of £100,000 to the credit of the colonial secretary, in trust for such railway company when formed, and he and his associates were thereby to become such Jamaica Railway Company. The railway company was to acquire the railway and its property, releasing to the government\ of Jamaica its interest in the said deposit of £100,000, and issuing to the government of Jamaica £700,000 of an entire issue of £800,000 of the second mortgage bonds of the railway company, and Wesson and his associates were to transfer to the colonial secretary, as security for the performance of their contract, the remaining £100,000 of second mortgage bonds, to be held by the colonial secretary till the completion or the road. This £100,000 of second mortgage bonds issued to the "promoters," as Wesson and his associates were called, was to be issued to them in return for the £100,000 cash deposited with the colonial secretary in trust for the railway company; and Wesson and his associates were to receive at the same time the same amount (£100,000) in the stock of the railway company. As sections of 12½ miles of the extensions were completed, the promoters were to receive £8,000 in first mortgage bonds, and the same amount in stock of the railway company. They were also to receive for every mile of the extensions completed one square mile of land in the island of Jamaica. For every such section they were also entitled to receive, when the whole road was completed, the further amount of first mortgage bonds of about £4,000. These were called the "deferred first mortgage bonds." Thus the promoters, Wesson and his associates, or the corporation into which they were to be formed, would, besides the land grants, receive the entire issue £1,500,000 of first mortgage bonds, of which £530,000 were to be withheld till the completion of the railroad and full performance of the agreement, and the rest from time to time as the work progressed, all the stock of the railway company from time to time amounting to £1,030,000 and £100,000 second mortgage bonds, which, however, were to be withheld till the completion of the work by the government as security. £30,000 of the first mortgage bonds part of the £530,000 were also to be held by the government for one year after the completion of the road to secure performance by the promoters of certain obligations assumed in respect to the road after completion. Mr. Wesson having obtained this concession, and before the incorporation of either the Jamaica Railway Company, or the West India Improvement Company, or the passage of the legislative act, went to London, and there, in the month of April, 1889, procured a subscription for debenture bonds of his proposed West India Company on the basis, as expressed in the subscription paper, of a total amount of bonds £200,000, and of the company being organized as a New York corporation with a share capital of £400,000, and the subscriptions entitling the subscribers to a bonus of £500 of the full-paid stock of the company with each £1,000 of bonds subscribed. It was provided in said subscription paper that the incorporation of the company should be conducted in a manner satisfactory to certain counsel named in the city of New York; that it should cease to be binding if the legislative council of Jamaica declined

to ratify the agreement with Wesson, or, if the whole amount of the £200,-
000 of bonds were not subscribed by the 1st of September, 1889, by subscribers
satisfactory to Messrs. Speyer & Co., of London; and that nothing should be
paid under the subscriptions unless Wesson and his associates should make due
assignment of all their rights under the agreement to the company; and the
carrying out of this agreement and all its provisions was to be made satisfac-
tory to the counsel named in New York.

Prior to the subscription to these bonds of the company, which was after-
wards incorporated as the West India Improvement Company, although with
some material variation from the plan outlined in the subscription paper, Mr.
Wesson negotiated with a firm of bankers in London—Anthony Gibbs & Sons
—a contract, by which Gibbs & Sons undertook to pay 95 per cent. for £700,-
000 of the first mortgage bonds of the Jamaica Railway Company, and were
to have an option on all the residue of said first mortgage bonds up to the full
amount of £1,500,000 at the same rate. Under this subscription paper sub-
scriptions were taken for these so-called "debenture bonds" to a considerable
amount, and further subscriptions were obtained in New York. Upon the
basis of these subscriptions obtained, the West India Improvement Company
was organized in August, 1889. The articles of incorporation are not in evi-
dence, but the plaintiff's mortgage recites that the company was organized
under the act of June 6, 1881, an act to authorize the formation of corporations
for the purpose of acquiring, constructing, and operating railroads in foreign
countries, and on the 1st of September, 1889, it executed and delivered to the
Central Trust Company, the plaintiff in this action, as trustee, its mortgage,
and issued bonds to be secured thereby, called therein "first mortgage bonds,"
to the amount of $921,000. The capital stock was fixed at $500,000, instead
of $2,000,000 as proposed in the subscription paper, and a bonus in stock
was given to each bondholder, which was contributed by stockholders who had
subscribed and paid for their shares. This instrument called the "first mort-
gage" of the West India Improvement Company to the Central Trust Company
of New York, after reciting the organization of the company under the act
above referred to, and that it was organized "for the object and purpose of
constructing, maintaining, and operating railroads already constructed in whole
or in part, and to construct, maintain, and operate further lines of railroad,
said roads, constructed and to be constructed, to run from Kingston" to cer-
tain other points named in the island of Jamaica, "and to construct, maintain,
and operate, in connection with such railroad or railroads, lines of telegraph, and
such lines of steamboats or sailing vessels as may be proper or convenient to
use in connection therewith, and also to construct, maintain, and operate rail-
roads from and to such other points on such island of Jamaica as may be
deemed advisable"; and after reciting also the conveyance to it by deed from
Frederick Wesson of certain grants and concessions for the purchase, mainte-
nance, and operation of the existing railways in the island of Jamaica, and for
the construction, maintenance, and operation of certain extensions thereof, and
of other rights, powers, privileges, franchises, and liberties thereto appertain-
ing, which grants and concessions are embodied and set forth in a bill of the
legislative council of Jamaica, known as the "Jamaica Railway Company's
Law, 1889," passed June 18, 1889; and, after reciting also that the enjoyment
and exercise by the parties of the first part of said grants and concession will
be in pursuance of the objects of its formation as above set forth, and that the
company, for the purpose of carrying out the said objects of its formation, and
for the full enjoyment of such grants and concession, and for the purpose of
exercising all the rights, powers, privileges, and franchises, and liberties con-
tained in the said grants and concession, and for the purpose of purchasing
and improving "such property as shall be necessary therefor, and for the pur-
pose of paying all debts incurred by it in the purchase, construction, and equip-
ment of said railroads, lines of telegraph, and such other lines as above men-
tioned or set forth, is desirous of borrowing the sum of $1,000,000 by the is-
suing of" bonds, etc., to be "secured by a first mortgage or deed of trust given
by the company to the party hereto of the second part upon all its said fran-
chises and concessions and upon all other property, real and personal, rights,
privileges, franchises, and liberties so as aforesaid acquired by it or hereafter
to be acquired by it, or to which it shall be lawfully entitled in conformity with

the provisions of the said the Jamaica Railway Company's law"; and reciting also the proceedings of the stockholders and board of directors authorizing the said bonds and mortgages,—then proceeds to grant and convey to the trustee "all the grants and concessions for the purchase, maintenance, and operation of the existing railroads in the island of Jamaica, and for the construction, maintenance, and operation of certain extensions thereto, which said railroads, when completed, are to run from Kingston" to certain other points named, "and all other rights, powers, privileges, franchises, and liberties appertaining and belonging to said grants and concessions, or set forth, contained, or embodied in a bill of the legislative council of Jamaica known as 'the Jamaica Railway Company's Law, 1889,' passed June 18, 1889, which said grants and concessions, together with the rights, powers, privileges, franchises, and liberties thereunder or thereto appertaining or belonging, have sold, conveyed, and transferred to the party hereto of the first part, by Frederick Wesson and associates, by deed," etc., and "also all lands, tenements, and hereditaments now owned, acquired, or appropriated, or which hereafter may be owned, acquired, or appropriated, by the party of the first part by virtue of the said concessions, when and as the same shall be conveyed to or come into possession or ownership of the party of the first part, and all railways, rights of way, leaseholds, leases, agreements, and contracts now owned or hereafter to be acquired and owned by said party of the first part by virtue of said concessions, when and as the same shall be so acquired and owned, and also the common capital stock of the Jamaica Railway Company to the par value of one million pounds sterling, a corporation to be organized and formed under and in pursuance of the provisions of said acts of the legislative council of Jamaica," etc., "as the said common capital stock shall be received by the party of the first part pursuant to said act, and also all other property or rights of property, real, personal, or mixed, now held and acquired, or which the party of the first part may hereafter hold, acquire, or be entitled to in, for, upon, by reason of, or in connection with the purchase, construction, maintenance, or operation of said railway, or under or in pursuance of the provisions of such act, or any of the grants, concessions, rights, powers, privileges, franchises, or liberties thereby conferred"; together with all and singular the tenements, "hereditaments, and appurtenances thereunto belonging or in anywise appertaining, and the rents, issues, emoluments, and profits thereof."

The said instrument contained, among others, the following provisions: "Third. This mortgage or deed of trust shall not operate nor be held to prevent or prohibit the company, its successors and assigns, from selling and conveying or otherwise disposing of for its use and benefit any of the hereby-demised real or personal property now owned or hereafter to be acquired by it, which at any time cannot be advantageously used or employed in the proper and judicious management of the business of said company, or the possession and enjoyment of which shall not operate or inure to its benefit, but in no case shall any sale or any other disposition of said property be made without the express written assent thereto of the trustee, evidenced by said trustee joining in every such sale, conveyance, or transfer; and such property so then sold, conveyed, or transferred shall thereupon and thereafter be wholly freed and released from the lien and operation of this mortgage. The verified certificate of the president of the company shall be sufficient evidence to the trustee of the propriety of any release hereunder. Fourth. Until default shall be made in the payment of the principal or interest of the bonds hereby secured, or of some of them, at the times and in the manner in said bonds and in the coupons accompanying the same respectively provided for the payment of said principal and of the said several installments of interest, respectively, as the same, respectively, fall due, and until the failure and omission on the part of the company to keep and perform the covenants by this indenture undertaken and agreed on its part to be kept and performed, or some of them, the company shall be suffered and permitted to hold, possess, control, manage, operate, and enjoy all the hereinbefore described property, real and personal, grants, concessions, rights, powers, franchises, and liberties, with the appurtenances thereunto belonging, and to receive and use the income, rents, issues, profits, and emoluments thereof, in the same manner, and to the same extent and effect, as if this deed had not been made. Fifth. In case default shall be made in the

payment of any installment of interest upon any or either of the bonds hereby secured, and such default shall continue for six months after the coupons for such interest shall have been duly presented for payment, and payment of the same duly demanded, then and thereupon the said trustee, if requested so to do by 60 per centum in interest of the holders of the bonds hereby secured, and then issued and outstanding, by an instrument in writing signed by them, shall take possession of, have, use, control, enjoy, enter into and upon and occupy all and singular the premises, property, rights, grants, concessions, franchises, and privileges hereby granted and conveyed, or intended so to be, and each and every part thereof, and everything thereto appertaining or belonging, operating and managing the same and conducting the business of the company by such superintendents, managers, receivers, or other agents as said trustee or its successors may deem necessary or advisable, expending from time to time all such sums of money as may seem to it or them to be judicious, necessary, or proper for the due use and full enjoyment of such properties and concessions, and to collect and receive all incomes, rents, issues, profits, and emoluments resulting from such possession, occupation, use, and enjoyment, and every part thereof; and, after deducting the amount so necessarily or properly expended, and all payments which may be made for rents, taxes, assessments, and for all charges or liens superior to the lien of these presents of or upon the said premises, or any part thereof, as well as the just compensation for its or their own services, to apply the net income, rents, issues, profits, and emoluments arising as aforesaid to the payment of the interest coupons due and unpaid on the whole issue of said bonds," etc., "and, after paying all such interest in full, and upon the further written request of the holders of 60 per centum in amount of said bonds, to reconvey the said premises to the said company." The said instrument further provided: Seventh. That in case of default in the payment of interest continuing six months, or the principal or any part of the principal due on the bonds continuing six months, the trustee might take possession of, have, use, control, enjoy, enter into and upon and occupy "all and singular the premises, property, rights, grants, concessions, franchises, and privileges hereby granted and conveyed, or intended so to be, and each and every part thereof," etc., and out of the net income to pay the amount due upon such interest or principal. Eighth. That the trustee, in case of six months' default, might sell at public auction, in the city of New York, "all the estate, property, rights, franchises, and concessions hereby conveyed or intended to be conveyed, or any part thereof." This instrument was registered in the record office at Kingston, in the island of Jamaica, on the 18th of October, 1889.

The first question that arises is whether the securities which are the subject of controversy in the action, £1,030,000 of the capital stock of the Jamaica Railway Company, £100,000 of the second mortgage bonds of said railway company, and £30,000 of the first mortgage bonds of said railway company, are covered by the plaintiff's mortgage, or whether, under the terms thereof, the West India Improvement Company were at liberty to use the same for raising money to pay the expenses of the construction of the road without compliance to the third article above recited, requiring the assent of the trustee, by its joining in the conveyance. It is the theory and contention of the defendants that what was mortgaged or covered by this instrument was the grants and concessions made to Frederick Wesson and his associates, and that the stock and bonds earned by the West India Improvement Company, the assignee of Frederick Wesson, are the income, issues, emoluments, and profits of such concessions, and that these stocks and bonds were not within the intention of said instrument to be covered by or included within the lien of the mortgage, unless they should remain as the property of the company after the completion of the road; that meanwhile the company was to be at liberty to use the same as such issues and profits of the concession by sale, hypothecation, or otherwise, for the purpose of constructing the railway, and paying debts that might be incurred in such construction. Some reliance seems to be placed upon the fact that the subscribers to these bonds to be afterwards created have called them "debenture bonds," and that the subscription paper refers only to the right, title, and interest of Frederick Wesson and his associates under the agreement made by him with the officers

of the colonial government, as the property to be vested in the company, and
pledged under a deed of mortgage to a trustee. In the subscription paper,
also, the bonds are referred to as debenture bonds. This agreement of the
29th of March, 1889, a copy of which was exhibited to the subscribers for
the bonds, and a copy of which is also appended to and incorporated into the
act of the Jamaica legislative council, contained all the main features of the
agreement finally entered into, and extended at large in the legislative act,
in respect to the issue of stock and first and second mortgage bonds of the
railroad company, and the disposition thereof, including the provision for the
issue of a million and a half of first mortgage bonds,° and their negotiation
at not less than 95 per cent. by the promoters. It, however, was an agree-
ment with Wesson and his associates, and contained no express provision for
the incorporation of Wesson and his associates into a corporation, as the law
subsequently passed did. I think little importance is to be attached to the
form of the subscription paper or the nature of the plan for future opera-
tions, which was, as shown by that paper, in the minds of those interested
in the enterprise at the time of that bond subscription in April. When the
company was organized, in August, there were several departures from the
plan proposed in April. It may well be that in April the scheme was to issue
obligations in the strictest sense debentures, based alone upon the conces-
sions granted by the government of Jamaica to Wesson; but when, on the
1st of September, the mortgage was drawn, it departed in several particulars
from this original plan. Meanwhile the law had been passed by the legisla-
tive council at Jamaica, and a provision definitely made for the acquisition
by the railway company of the securities of the railway company. The construction
of the mortgage must be determined by its own terms and language, if they
are clear, and not by the provisional and incomplete scheme outlined in the
subscription paper. That which is covered by the mortgage by its express
language is not only the grants and concession made to Wesson, but in terms
the shares of the capital stock of the railway company which might come
into the possession of the West India Improvement Company, and all other
property, real and personal, which, by virtue of the concessions, and the
execution of the agreement of Wesson with the government, might come into
its possession, together with the rents, issues, emoluments, and profits not
only of the grant and concession, but of said other property; and the recitals
of the mortgage contain a marked distinction between the property which
passed from Wesson to the company, namely, the grants and concessions
and the property which it was intended to convey to the trustee, namely, the
said franchises and concessions, and all other property, real or personal, ac-
quired by it, or hereafter to be acquired by it, or to which it shall be lawfully
entitled in conformity with the provisions of the said railway law. Such
other property was to come to the possession of the West India Improvement
Company, the mortgagor, by the terms of the contract, namely, the land grant,
the stock, and the first and second mortgage bonds; and, in my opinion, the
terms of this mortgage are too definite to treat the stock, bonds, and land
thus coming or to come into the possession of the mortgagor merely as issues
or profits of the original concessions, or grants to Wesson, within the meaning
of those words as used in the mortgage, or as not intended to be given spe-
cifically when acquired for the security of the bondholders, as contended on
the part of the defendants. The expression, "rents, issues, and emoluments,
and profits thereof," follows and evidently relates not alone to the conces-
sion, but to the other property, including the stock, bonds, and lands.

It is very true that in one sense all these properties which in course of the
performance of the contract should go into the possession of the mortgagor
were the issues and profits of the concession,—that is to say, they were to
be acquired by the exercise of the rights granted to Wesson and his assigns,
which constituted said concessions and franchises; but in another, and a
very proper, sense, they may be said to be not so much the issues and profits
of those concessions as property into which, by the performance of the con-
tract, those franchises and concessions were to be converted. In the begin-
ning of the enterprise there was nothing but a franchise and concession, but
by the performance of the contract those rights of property which rested in
a mere franchise and concession would become transmuted into the stock,

and bonds and lands to be received as a compensation for the performance of the contract. These things to be acquired represented, and may be deemed within the intention of the parties to represent, the capital or principal assets to which the company would become entitled, and which, in place of the grants and concession, would be the security which the bondholders were to enjoy by virtue of the mortgage; and the term "rents, issues, emoluments, and profits" had a proper application to the stocks, bonds, and lands. There might be dividends on the stock pending the performance of the contract. There was a finished railroad of 65 miles, which was presumably already in operation, and which was to pass to the railway company almost immediately. The bonds bore interest from the time of their issue, and the lands were susceptible of producing rents. The word "rents" here used is hardly applicable to anything but the lands to be granted. Nor is there anything in the third, fourth, and fifth, and seventh clauses of the mortgage, quoted above, of sufficient force to show that the words "rents, profits, issues, and emoluments" were confined to the franchises and concessions alone, and were intended to include or refer to the stock, bonds, and lands to be earned by the company. Indeed, in each of those clauses the general word "property" seems to have been carefully used to secure the application of those clauses to every part of the several things granted, or intended to be covered, by the granting clause of the instrument. It is true that the third clause, quoted above,—apparently borrowed from a similar provision in railroad mortgages, —has rather a forced application to the subject-matter of this mortgage. The only business of the company, so far as appears, was the purchase of the stock in this railway company, the building of this railroad, the taking to itself of these securities and lands, and, after the railroad was finished, the enjoyment, through its ownership of these securities, of the beneficial interest in the railway itself. It is to be observed that under the contract the road might be completed in less than 10 years, for which the bonds were to run; and it can hardly be supposed that at the end of the 10 years, when the principal of the bonds became due, it was the expectation of the parties to look to franchises and concessions alone for the payment of the principal of the bonds, when those franchises and concessions would have been converted into the other property enumerated in the mortgage as subject or to become subject to its lien. This third provision of the instrument refers to the property transferred as real or personal property now owned or hereafter to be acquired by the company. It provided for a sale or conveyance of any such property with the written assent of the trustee, provided that the president of the company should certify to the trustee the propriety of any such release; and the property so to be sold under this power was any of such property which could not be judiciously used or employed in the proper and judicious management of the business of the company. It may be said that all of this property so to be afterwards acquired might fall within this description, whereas in the case of a railroad to which a similar clause in a railway mortgage is usually applied there is always some part of the property of the corporation which is actually used, or necessary for use, in its business, and some other part which is not so used, or necessary for use. I do not think that this peculiarity in the character of the property covered by the mortgage compels, or even suggests, any limitations upon the very explicit language of the granting provisions of the instrument, or upon the full and explicit description of the property included within the terms of the third clause; and the only proper inference to be drawn from the third clause is that the parties intended to give the trustee full power over all this property if, in the progress of the enterprise, it should appear that a sacrifice of a part of it for securing the success of the enterprise should be in the interest of the bondholders. By the terms of the contract all the stock and all the bonds were liable to be forfeited if the road was not completed. This sufficiently secured the action of the trustee in common with the company under this third clause, if a sale of any of the securities should become necessary for completion of the road. It appears in evidence that the projectors of this scheme supposed that the million and a half of first mortgage bonds, the negotiation of which is provided for in the contract, would be more than sufficient, in addition to the other resources of the company, for the construc-

tion of the railway, and, although the work largely exceeded the first esti-mates, this expectation was based on estimates carefully made at the time. These first mortgage bonds come literally within the description of the prop-erty to be acquired by the company within the terms of the mortgage. It was made the duty of the company, however, by the Jamaica railway law, and by the original contract of Wesson, to negotiate these bonds at a limited price, and to apply the proceeds to the building of the extensions. This is certainly true of all the first mortgage bonds coming to the company other than the £530,000 of deferred first mortgage bonds, which were not deliver-able to the company until after the completion of the road.

The fourth clause above quoted, allowing the company to retain in its own possession and under its own control all the properties granted until de-fault, and all the income, rents, issues, profits, and emoluments thereof, seems to be adapted to this contract from a similar clause common in railroad mort-gages. There is no inconsistency between this clause and the view above expressed with regard to the scope and intention of the mortgage. What is herein described as "all the hereinbefore described property, real and personal, grants, concessions, rights, powers, franchises, and liberties" clearly includes the stocks, bonds, and lands, as well as the grants and concessions, before described and referred to. These were to be possessed, controlled, managed, operated, and enjoyed by the company until default in payment of the interest on the bonds. The words do not imply a power to sell or dispose of them, especially as sale or other disposition of them is expressly regulated by the third clause; and the difference in the language of this fourth clause in re-spect to the property, and its rents, issues, profits, and emoluments, shows that, while the company were permitted to hold, possess, and enjoy the prop-erty, a greater liberty was given to them with regard to the rents, issues, and profits which they were not only to receive but to use. This term "use," as applied to what would be money in their hands, implies a right to dis-pose of it generally in the conduct of the business of the company. I think, therefore, the conclusion must be, with regard to this mortgage, that it was intended to cover and bring within its operation as received the stocks, bonds, and lands to be acquired as the work progressed, unless it be with the possi-ble exception of the first mortgage bonds, with regard to which some further suggestions will be hereafter made; and that the original plan of the issue of debentures secured by a mortgage or trust assignment of the grants and concessions alone was accordingly modified, when, in September, 1889, this mortgage was made.

It is urged, however, on the part of the defendants, that the conduct of all the parties interested in this property was such with reference to the securi-ties received by the company in the course of the performance of the contract as to show that the intention of the mortgage was in accordance with the apparent original intention of the subscribers to the bonds, to treat all these securities merely as profits or issues of the grant and concession, and to put them under the control of the company to be freely disposed of for the pur-pose of executing the work. Undoubtedly, in cases of doubtful construction, the acts of the parties, and their own interpretation of the agreement as shown by their conduct in its performance, are of controlling weight. There is, I think, however, nothing proved in this case which overcomes or impairs the very clear inferences to be drawn from the express terms of this instrument. One of the principal circumstances relied on by the defendants as showing the conduct of the parties in interest inconsistent with the view above ex-pressed as to the scope of the mortgage, is the disposition which was made of the first mortgage bonds to which the company became and was to become entitled by the performance of the contract. It has been already observed that the Jamaica Railway Company's law, the terms of which were embod-ied in the contract between Wesson and the government, had special provi-sions with regard to these first mortgage bonds, the total issue of which to the company was to be £1,500,000. These provisions were inserted apparent-ly for the purpose of making it certain that the company should have funds available for the work to be done. The law provided not only for the issue to the promoters, from time to time, on the construction of sections of 12½ miles, of a certain amount of these bonds, but it expressly provided in said

law as follows: "Forty-Eight. All money borrowed or to be borrowed by the company [that is, the railway company] on first mortgage bonds under the provisions of this law shall be devoted to the purposes set forth in the said agreement, and not otherwise." The agreement was an agreement for the purchase and construction of the railway by the promoters, and in that agreement it was provided: "Nine. That immediately on the formation of the company [i. .e. the railway company] it shall execute first mortgage bonds bearing interest at a rate not exceeding 5% per annum to the total amount" of £1,500,000, and "place them in the hands of trustees to be agreed upon between the government and the promoters, upon trust to hold the same until issue, and to issue the same from time to time only in accordance with this agreement and with the consent of the governor of Jamaica for the time being, and on production by the allottee of a receipt from the bank or other institution into which, under article twelve, the proceeds of bonds have to be paid, showing that the sum in respect of which the same has been allotted has· been paid into such bank or institution to the joint account of the governor and the company. Ten. No bond shall be valid to bind the company unless it has been issued by the trustees aforesaid. Eleven. The promoters undertake to negotiate these bonds at their own risk, trouble, and expense: provided that they shall not be issued below 95 without the consent of the governor. Twelve. All proceeds of bonds shall be placed in some bank or responsible moneyed institution to be agreed on between the governor and the promoters, to the joint credit of the governor and the company, and shall be paid out only on their joint signature. Thirteen. The issue of first mortgage bonds shall be regulated as follows: Immediately on the formation of the company [i. e. the railway company], the company may issue bonds to the extent of £320,000. As soon as twenty-five miles are completed, a second issue may be made of £200,000; on the completion of a second twenty-five miles a third issue may be made to the same extent; and on completion of seventy-five miles a fourth issue may be made, so as to provide such sums as may be required to make up £8,000 bonds per mile of the estimated length of the extensions. On the ultimate completion and transfer to the company [i. e. the railway company] of the said extensions, a further issue may, from time to time, be made to the full extent of £1,500,000. Fourteen. The proceeds of bonds shall be devoted solely to defraying the cost of the extensions in manner hereinafter provided, and of capital improvements on the line." "Seventeen. The promoters are to build and equip the extensions at their own expense. As a section of not less than 12½ miles is completed and added to the railway within the meaning of this agreement, the same shall become the property of the company on its paying for the same in proceeds of bonds at the rate of £8,000 bonds per mile and an equal amount of ordinary stock of the company. Eighteen. On the final completion of the extensions any of the bonds remaining unissued that shall be in excess of the rate of £8,000· bonds per mile of completed road, original and extension, shall be kept in reserve, to be issued only from time to time as occasion may require, with the consent of the trustees for the bondholders and of the governor of Jamaica, for defraying the cost of any capital improvements on the line as hereinbefore defined. The remaining bonds (after reserving bonds of the value of £30,000) shall be allotted to the promoters by way of deferred payment for the ·construction of the extensions. The above-mentioned £30,000 bonds shall be kept in reserve for a period of twelve months, during which time they may from time to time be issued as money is required to defray the cost of any repairs or replacements that the promoters may be under obligation to make upon the railway. At the conclusion of said period of twelve months, the said bonds, or so much of them as shall remain unissued, shall be allotted to the promoters." ·

It has also already been noticed that one of the first things done by Mr. Wesson after obtaining the concession was to make a contract with Anthony Gibbs & Sons, of London, by which Gibbs & Sons undertook to purchase at 95 per cent. £70,000 of the first mortgage bonds, and to place the money in bank in conformity with this scheme, subject to the control of the promoters and the government of Jamaica; and that Gibbs & Sons also took an option for the purchase on the same terms of the remainder of the whole

issue of first mortgage bonds. When the West India Improvement Company was formed, and when its first mortgage was made and bonds issued thereunder, this agreement was in force, and was known to the parties who became interested in the enterprise as subscribers. It may, indeed, be doubted whether the deferred first mortgage bonds payable to the promoters only upon the completion of the road were within that provision of the agreement which required the proceeds of all first mortgage bonds to be devoted to the completion of the work. It would seem, at least, that, so far as the proceeds of these bonds were not necessary, or might not be necessary, to pay in full the cost of the road, they were not within this provision of the agreement or the above-recited provision of the railway law, and that the whole or a part of the £530,000 deferred first mortgage bonds might have come to the promoters—that is, to the West India Improvement Company—freed from any such obligation with regard to the application of their proceeds. In September, 1894, 75 miles of the 120 miles of the extensions undertaken to be constructed by the West India Improvement Company being substantially completed, that company entered into a contract with James P. McDonald & Co. for the construction of the remaining 45 miles. That agreement refers specifically to the agreement made with Anthony Gibbs & Sons, to the fact that their option on a part of said bonds—that is, the whole issue above £700,000 —was about to expire; to the fact that the West India Improvement Company is receiving from time to time, in addition to its £8,000 of first mortgage bonds per mile, what were called "deferred payment certificates,"—that is, certificates that it would be entitled at the end of the work to £4,250 per mile in addition to the £8,000; and provided, among other things, for the raising of money upon a hypothecation of these deferred payment certificates substantially in accordance with the plan afterwards adopted; and for the purpose of enabling McDonald & Co. to raise the funds necessary for the performance of their contract three different attempts were afterwards made to raise money upon these deferred payment certificates during the years 1894 and 1895, the second and third of which were successfully carried out, and the West India Improvement Company raised on this security sums aggregating $1,000,000 upon the pledge of these very deferred payment securities, —that is to say, its interest in the first mortgage bonds coming to them at the end of the work; and the Central Trust Company, the plaintiff in this action, was the trustee of these two trust agreements. It is claimed that these transactions show that the West India Improvement Company and the Central Trust Company, as well as the principal holders of bonds under plaintiff's mortgage, many of whom had knowledge of these transactions, understood that the securities coming to the West India Improvement Company under its contract, namely, the stock, second mortgage bonds, and first mortgage bonds, were all liable to be disposed of freely for the purpose of raising money to construct the road, notwithstanding the mortgage to the Central Trust Company. I think these inferences cannot be fairly drawn from the acts of the parties. The rights of the bondholders under the mortgage of September 1, 1889, from the West India Improvement Company to the Central Trust Company, were undoubtedly subject to any disposition made or agreed to be made of the first mortgage bonds in conformity with the original agreement between the promoters and the government of Jamaica, and required by the railway company law, which was embodied in that agreement; and I think the proper inference to draw from these transactions is, rather, that the parties to that mortgage, in view of the prior contract made with Anthony Gibbs & Sons, and in view of the terms of the agreement and the law referred to, regarded the whole issue of first mortgage bonds as subject to disposition in the manner so provided in the agreement and the law for the purpose of raising money to construct the road, and understood that whatever power of disposition was given by the mortgage to the Central Trust Company was subordinate to these prior arrangements entered into for the disposition of the first mortgage bonds, and that this course of conduct does not show that they regarded all the securities to be received under the contract as freely subject to disposition, uncontrolled by the third clause of the mortgage, for the purpose of raising money to construct the road. The three schemes for raising money in the years 1894–95 applied only to these first

mortgage bonds, and did not include any part of the stock, or of the second mortgage bonds, to which the company was or would become entitled, nor to the land grants. This discrimination between the first mortgage bonds and the stock, and the fact that these shares of stock were held for years by the West India Improvement Company, free of all restraint in respect to its disposition of them, except by reason of said mortgage, and that large sums of money were at all times needed in the prosecution of the work, are most persuasive evidence that the company understood that the stock was intended to be covered by the mortgage to the plaintiff.

Assuming that the first mortgage bonds, or that part of them which would come to the company as a deferred payment at the completion of the road, came within the terms of the mortgage, the disposition of them in the two loaning agreements that were made in 1894–95, while not strictly in accordance with the terms of the mortgage, nor made in conformity with the third clause above recited, could probably not have been questioned as binding upon the parties to the mortgage. The Central Trust Company, by becoming the trustee under those arrangements, and a party to the agreements by which the hypothecation was made, did give its written assent thereto; and the president or acting president of the West India Improvement Company, in executing said instrument on behalf of the company, virtually certified to the propriety of such disposition of the bonds. While, therefore, the form of disposition adopted tends to show that the parties did not regard the disposition of these deferred bonds as regulated by the third clause of the mortgage, the difference in the provisions of the agreement between the promoters and the government and in the railway law in respect to the first mortgage bonds and in respect to the other securities sufficiently accounts, in my opinion, for these transactions, without supposing that any of the parties engaged therein by his or its conduct in those transactions expressed or indicated an understanding that the stock and second mortgage bonds were liable to be disposed of in the same way. It is unnecessary to determine in this action whether the view thus taken by the parties was correct or not. The language of the railway law and the agreement is broad enough to embrace these deferred bonds with those actually to be received in the progress of the work whose negotiation was otherwise provided for, and the government and the railway company had an interest in having the entire cost of the road paid up; and in fact, as the event proved, the application of these deferred bonds was necessary for this purpose. I think the view apparently taken that these deferred bonds were subject to the paramount provisions of the agreement, and not to the third clause of the mortgage, whether right or wrong, was the view taken by the parties, and that their acts referred to expressed nothing more. Another course of conduct or series of acts relied on by the defendants as showing the same purpose or understanding, is that the Central Trust Company, as trustee under the mortgage, never took possession of the certificates of stock received by the West India Improvement Company from time to time. It is a sufficient answer to this suggestion that under the terms of the mortgage they were not permitted to take possession of such certificates until default was made in the payment of interest, and no such default had occurred prior to the commencement of this action. The second mortgage bonds had not come into the possession of the West India Improvement Company until after the mortgage of hypothecation was made to the Manhattan Trust Company, and not until the 23d of October, 1896. Till that time, or shortly before that time, they had continued in the name of the colonial secretary of Jamaica.

It is urged also that the Central Trust Company did no act on their part to make known their rights. The only thing that they could have done which is suggested is that they might have given notice or warning to the railway company in Jamaica of their rights, so as to prevent the West India Improvement Company from dealing with these securities, as they came into their hands, adversely to the interests of the bondholders. As above noticed, the Central Trust Company had recorded its mortgage in Jamaica. What efficacy this has as notice does not appear, but it would seem that their failure to give notice to the railway company is not an act which indicates a purpose or understanding that the West India Improvement Company had

63 N.Y.S.—55

the right to dispose of the stock in violation of the terms of the mortgage, nor are they to be held in fault for not anticipating that the West India Improvement Company might, in violation of the terms of the mortgage, dispose of the securities which it had pledged to the mortgagee. Nor are the securities covered by this mortgage "chattels," within the meaning of the law of this state, requiring the filing of chattel mortgages as a protection against subsequent purchasers.

An attempt was also made to show that the beneficiaries under the plaintiff's mortgage—that is, the bondholders under the plaintiff's mortgage—had assented to the subsequent transfer of these securities to the Manhattan Trust Company. The rights of the Central Trust Company as mortgagee would be lost if all the bondholders, its beneficiaries, assented to the subsequent transfer; but no such case was made out. It is possible that some of the directors of the West India Improvement Company who voted for the resolution approving the mortgage to the Manhattan Trust Company have, by that act, waived all claim as against the beneficiaries under the Manhattan Trust Company's mortgage, but there is no evidence which warrants the conclusion that any of these directors represented any considerable amount, much less the whole, of the bonds under the Central Trust Company's mortgage for any such purpose.

These are the principal grounds which are urged on behalf of the defendants as showing that the circumstances under which the mortgage was made, and the contemporaneous and subsequent conduct of the parties, give it a construction other than that hereinbefore attributed to it, and which its language clearly requires. They are, in my judgment, wholly insufficient as proof of any such understanding. Assuming, then, that it was the intention of this mortgage to cover, and to give the bondholders the benefit of, the stock and bonds of the railway company, as well as the lands granted to the West India Improvement Company in the progress of the work, the next question is, what is the nature of the interest which the Central Trust Company, on behalf of the bondholders, acquired in the shares of capital stock and the bonds which are the subject of this action? I think there can be no doubt that the Central Trust Company acquired only an equitable right to have these securities applied under the mortgage for the benefit of the bondholders. It did not acquire, either in the stock or in the bonds, any legal title. The stock that was received by the West India Improvement Company remained, and it was the intention of the mortgage that it should remain, in the name of the West India Improvement Company. The legal title to the second mortgage bonds was never vested in the West India Improvement Company until after the hypothecation to the Manhattan Trust Company, when the bonds were changed from standing in the name of the colonial secretary into bonds deliverable to bearer, and so passed first to the West India Improvement Company and from them to the Manhattan Trust Company under the instrument of hypothecation dated the 3d of September, 1896. The authorities are conclusive in this state, without going into the question of the law elsewhere, that, while it is competent to include in a mortgage after-acquired property, or property coming into existence after the date of the mortgage, yet the right thereby acquired by the mortgagee is merely a right in equity to have this after-acquired property applied for the security of the mortgage. Weetjen v. Railroad Co., 4 Hun, 529; Kribbs v. Alford, 120 N. Y. 519, 24 N. E. 811; McCaffrey v. Woodin, 65 N. Y. 459; Distilling Co. v. Rasey, 142 N. Y. 570, 37 N. E. 632. It is in the nature of a chose in action, or equitable right, or executory agreement, to so apply them; and this was the situation of affairs at the time of the transfer of these same securities by the West India Improvement Company to the Manhattan Trust Company on the 3d of September, 1896. The title still remained in the West India Improvement Company in the shares of stock that had been delivered to it; and, as regards the second mortgage bonds, that company had only an equitable interest, the title being in the colonial secretary; and as to the £30,000, the remainder of the deferred first mortgage bonds, they were held by the government, and are still held, as securities for certain obligations imposed upon the West India Improvement Company by the construction contract. They may never come to the possession of the West India Improvement Com-

pany. In this position of affairs the West India Improvement Company, being largely indebted to J. P. McDonald & Co. for the construction of the last 45 miles of road in nearly $800,000, took advice of counsel as to its right to use these securities for the purpose of raising money to pay off the claims of McDonald & Co., and other purposes. They seem to have been advised by counsel of standing that they had such a right. The West India Improvement Company itself was pressed by McDonald, McDonald was pressed by his creditors, and the times were times of great financial distress. Under these circumstances, Mr. Calvin S. Brice undertook to relieve the situation both of the West India Improvement Company and McDonald & Co. by the raising of money upon the stock and second mortgage bonds, and the right, whatever it might be, in the £30,000 first mortgage bonds, which were virtually all the assets in the possession or under the control of the West India Improvement Company; and this plan of hypothecation to the Manhattan Trust Company as trustee was resorted to for the purpose of such relief. It is claimed on the part of the West India Improvement Company that Mr. Brice undertook absolutely to raise $1,000,000 upon loans extending for a year for the purpose of financing the two companies. The testimony on the question of what Mr. Brice undertook to do is conflicting, but upon the whole proofs I am unable to find that he entered into such an agreement. Under the circumstances of the times and the situation of the parties, it seems to me that the arrangement testified to by Mr. Wesson, the president of the West India Improvement Company, as the undertaking of Mr. Brice, was highly improbable and that Mr. Brice's testimony, which is substantially that he undertook to relieve the immediate situation by effecting a loan running four months, and to use his best endeavors afterwards to get the loan extended for a year, is much more probable. And I think that Mr. Wesson is mistaken in respect to what Mr. Brice promised to do. At any rate, the loan, made nominally for $1,000,000, was upon four months' notes taken in the first instance by Mr. Brice and McDonald & Co. for the purpose of providing for the debt of the West India Improvement Company to McDonald & Co., and afterwards distributed in part among the creditors of McDonald & Co. and other holders. Some of the notes were pledged for cash loans. Those to Samuel Thomas, the Chase National Bank, and the Manhattan Trust Company were so disposed of, amounting in the aggregate to $190,000. It is claimed on behalf of McDonald & Co. that the agreement for the hypothecation of these securities for their benefit was made in Jamaica shortly prior to the 3d of September, between Mr. McDonald, representing his firm, and Mr. Wesson, representing the West India Improvement Company, and that thereupon McDonald & Co. surrendered the road to the West India Improvement Company; but the evidence upon this trial does not show that at the time this arrangement for the hypothecation of these securities was made between Mr. Wesson and Mr. McDonald in Jamaica anything was surrendered by McDonald & Co. to the West India Improvement Company which McDonald & Co. had any right, under their contract, to retain. The labor and materials put into the road they could not take back. They were licensed, it is true, to enter upon the lands for the purpose of performing the work, but this, it seems, gave them no possession of the road which they could hold as against the West India Improvement Company; nor does it appear that any part of the rolling stock or equipment was delivered upon this promise to hypothecate these securities. This transaction with the Manhattan Trust Company was consummated on the 3d or 4th of September. Under it, and according to its terms, four months' notes were to be given, which, in fact, were afterwards made, and were dated the 10th of September, running four months from the 10th of September. At the time of the execution of the mortgage to secure these notes an assignment of the stock and of the interest of the bonds was executed by the West India Improvement Company, and delivered to the Manhattan Trust Company, and the certificates of stock then standing in the name of the West India Improvement Company and indorsed in blank by that company were delivered to the Manhattan Trust Company. Afterwards a transfer of the stock to the amount of 53,000 shares was made by deed of transfer to the Manhattan Trust Company, and new certificates were issued to the Manhattan Trust Company by the railway company, which came

into the possession of the Manhattan Trust Company on or about the 26th day of October, 1896. The second mortgage bonds were surrendered by the colonial secretary, and changed into bonds payable to bearer, and delivered to the Manhattan Trust Company, on or about the 23d of October, 1896.

Some criticism was made upon the form of the deed of transfer from the West India Improvement Company to the Manhattan Trust Company of the certificates of stock. The deed of transfer was not in the very language which is annexed to the railway company's law as the proper form of transfer. The deed of transfer was, however, accepted by the railway company, and new certificates issued. I do not think that the variation was such as to prevent the legal title in the stock from passing, nor that the reference in usual form to the "conditions" on which the stock was held has any application to the possible equities of third parties. Thus, on or before the 26th of October, 1896, the legal title to 53,000 shares of the stock of the railway company and to £100,000 of the second mortgage bonds was vested in the Manhattan Trust Company. It is shown by the evidence that by the law of Jamaica the legal title to the shares of stock, even as between the parties, does not pass by the delivery of indorsed certificates, but only by a deed of transfer. Therefore, on the 4th of September, 1896, the Manhattan Trust Company acquired only an equitable interest in those securities. The respective rights of the plaintiff, the Central Trust Company, and the defendant the Manhattan Trust Company in the securities which are the subject of this action are to be determined by the rules which apply in equity as between parties who acquire at different times an equitable interest in the same property. The rule is stated by the supreme court of the United States in the case of Judson v. Corcoran, 17 How. 612, 614, 615, 15 L. Ed. 331. The case was one of a conflict between two successive assignees of a claim against a foreign government. The suit was brought by the first assignee to recover the amount of the award from the second assignee, Corcoran, who had made good his equitable claim by prosecuting the claim till an award had been made in his favor, thus becoming the legal owner. The court say: "Corcoran's assignment was fair, and accepted on his part without knowledge of Judson's; nor is the contrary alleged in the bill. And, assuming Judson's to be fair also, and that no negligence could be imputed to him, then the case is one where an equity was successively assigned in a chose in action to two innocent persons whose equities are equal according to the moral rule governing a court of chancery. Here Corcoran has drawn to his equity a legal title to the fund, which legal title Judson seeks to set aside, and asks an affirmative decree in his favor to that effect. Now, nothing is better settled than that this cannot be done. The equities being equal, the law must prevail. * * * And the same principle of protecting subsequent bona fide purchasers of choses in action, etc., against latent outstanding equities, of which they had no notice, was maintained in this court in the case of Bayley v. Greenleaf, 7 Wheat. 46, 5 L. Ed. 393. That was an outstanding vendor's lien, set up to defeat a deed made to trustees for the benefit of the vendees' creditors. The court held it to be a secret trust; and, although to be preferred to any other subsequent equity unconnected with a legal advantage or equitable advantage, which gives a superior claim to the legal title, still it must be postponed to a subsequent equal equity connected with such advantage. The rule was distinctly asserted by Chancellor Kent in 1817, in Murray v. Lylburn, 2 Johns. Ch. 442, before the question was settled in England, and before this court discussed it, which was in 1822. And the same principle was applied by the court of appeals of Virginia in the case of Moore v. Holcombe, 3 Leigh, 597, in 1832." The rule is thus stated in 2 Pom. Eq. Jur.: "Sec. 727. The case to be considered is not that merely of an equitable interest held by A., and a subsequent conveyance of the legal estate to B., in which the latter's superior right would be a simple application of the doctrine concerning bona fide purchase for a valuable consideration. The subject to be examined assumes the existence of successive equities held by different persons, equal in their nature, and acquired in such a manner that, having regard to these interests alone, the priority of right among them would depend upon their order of time. Under these circumstances it is assumed that one of the parties acquires in some manner the legal title in addition to his equity.

The settled doctrine is that, if a second or other subsequent holder, who would otherwise be postponed to the earlier ones, obtains the legal estate, or acquires the best right to call for the legal estate, he thereby secures an advantage which entitles him to a priority. It is absolutely essential, however, that he should have acquired his equitable interest without any notice of the prior claims, and that his subsequent procurement of the legal estate should be free from fraud and from undue negligence." "Sec. 730. The doctrine is universally settled, and has already been fully examined, that among successive interests wholly equitable, and between an earlier equity and a subsequent legal estate, even when purchased for a valuable consideration, the one who acquires the subsequent estate or interest with notice of the earlier equity in favor of another person will hold his acquisition subject and subordinate to such outstanding interest or right. In the contest for priority between the two claimants he must be postponed. He takes his interest burdened with the obligation of recognizing, providing for, and carrying out the previous equity according to its nature. This subordinating effect is produced alike by every species of notice. Actual notice, proved by direct or inferred from circumstantial evidence, and constructive notice arising from information sufficient to put the prudent man upon an inquiry, from possession, from the contents of title deeds, from lis pendens, from registration, from information given to an agent, or from any other cause, when once established, are followed by the same consequences upon the rights of the subsequent holder or purchaser. The doctrine applies to all successive equities in the same subject-matter, even when they are equal, and governed by the order of time; and in such a case it does not disturb the priority already existing." "Sec. 732. It is now settled by the English decisions, after some fluctuation, that, where a person has become entitled to the precedence because he has acquired the prior legal estate, or because, being subsequent in time, he has forfeited his equity by obtaining the legal estate, he cannot lose such precedence, and be postponed, unless by himself or by his agent he is chargeable with fraud or with gross negligence. Mere neglect will not suffice."

Besides the three holders of notes above referred to, who parted with their money relying upon the instrument of hypothecation and the assignment and a delivery of the certificates of stock as above referred to, the other holders of notes or persons claiming an interest therein are J. P. McDonald & Co., and various creditors of J. P. McDonald & Co., to whom notes were given by McDonald & Co. in payment of or as security for their debts. The instrument of the 3d of September, 1896, hypothecating these securities to the Manhattan Trust Company, was drawn by the attorney for McDonald & Co., and it is claimed on the part of the plaintiff that McDonald & Co. had notice of the prior equitable lien of the Central Trust Company, and that his attorney, in the course of the negotiations which led to that hypothecation, had notice of such prior equitable lien which is to be attributed to McDonald & Co., or that McDonald & Co. or their attorney were chargeable with such gross negligence and willful blindness in not discovering the existence of this earlier equity that McDonald & Co., even assuming that they were the holders for value of these notes held by them, were not bona fide holders or purchasers without notice, within the equitable rule above referred to. I think, upon the whole evidence it is not shown that Mr. Whitridge, the attorney of McDonald & Co., had or obtained actual knowledge of the plaintiff's right while transacting this business for his client. The rule does not seem to go so far as to attribute to a principal merely constructive notice to an agent, the ground upon which the knowledge of the agent is attributed to the principal being the presumption that the agent, in the discharge of his duty, has communicated the knowledge thus obtained to his principal. That Mr. Whitridge had great opportunities for learning of this prior equitable claim is undoubtedly true, but I do not think the evidence establishes the fact of his actual knowledge of it. The rule is thus stated in Wheatland v. Pryor, 133 N. Y. 102, 30 N. E. 653: "The reason for the rule which imputes knowledge of an agent to his principal is thus stated in Story, Ag. § 140: 'Upon general principles of public policy it is presumed that the agent has communicated such facts to the principal, and, if he has not, still the principal, having intrusted the agent with the particular business, the other party has a right to deem his

knowledge and acts obligatory upon the principal; otherwise, the neglect of the agent, whether designed or undesigned, might operate most injuriously to the rights of such party.' Now, within the reason of this rule, could the construction or imputed notice of the Boston Trust Company—it having no actual notice—be imputed to the plaintiff? There can be no presumption that it communicated to the plaintiff knowledge which it did not have. * * * The rule of constructive notice to a principal can have no operation whatever in a case where the agent himself has not received actual notice." In the case cited, however, it was held that the Boston Trust Company was not the plaintiff's agent. In respect to McDonald & Co. themselves, who have denied all previous knowledge of plaintiff's rights, there are circumstances of some weight which tend to attribute such knowledge to them. As appears by the loaning transactions of 1894 and 1895, they were fully informed of the provisions of the legislative act of the colony of Jamaica, and of Wesson's original agreement. They therefore knew that the West India Improvement Company must have, at the time of the loaning agreements, received a large amount of the stock of the railway company, as well as become entitled to the deferred certificates of first mortgage bonds. It seems strange that they should have accepted these deferred bonds as the basis of these loans without inquiry in respect to the certificates of stock which must have been received, and without ascertaining the reason why they could not have them as security.

At the time of this transaction, or prior thereto, there had been some question between McDonald & Co. and the West India Improvement Company in respect to the amount due McDonald & Co. There had also been grounds for a claim on the part of the West India Improvement Company against McDonald & Co. that McDonald's claim did not mature until the government of Jamaica accepted the railway. These points, however, were, during the negotiation which resulted in this hypothecation to the Manhattan Trust Company, so far adjusted that the West India Improvement Company admitted its present debt to McDonald for about $800,000, subject to the claim on the part of the West India Improvement Company to certain possible reductions of about $150,000. The matter of these reductions—whether they should be made or not—has never been settled between the West India Improvement Company and McDonald & Co. The notes first issued as representing the claims of McDonald & Co. were afterwards reduced by the amount of the notes taken by the creditors of McDonald & Co., and for cash loans, the proceeds of which were used in reduction of the debt. The amount of these notes held by creditors of McDonald & Co. is $153,928.37, and they are held by William Kenefick, Jr., H. A. Rogers, the Eppinger & Russell Company, the Rogers Locomotive Company, and the Ætna Powder Company, all of whom, except the Ætna Powder Company and the Rogers Locomotive Company, have been made parties to the action as defendants. Mr. Brice also claims an interest in some of the notes,—those which still represent the debt due to McDonald & Co., and in notes issued to the Southern Trust Company for moneys claimed to have been paid, and guaranties of payment claimed to have been given by him to sundry creditors of McDonald & Co., and for his services in the matter of arranging said loan. This claim for services has never been adjusted. Mr. Brice is not a party to the action. McDonald & Co. also claim to be entitled to be regarded as holders for value, since in taking the notes they agreed to give time to their debtor, the West India Improvement Company, till the maturity of the notes. Hubbard v. Gurney, 64 N. Y. 467. Their debt was presently due as adjusted, and they took four months' notes, and the circumstances tend to show that they agreed to extend the time of payment for at least four months. The whole object of the arrangement then made seems to have been to give the West India Improvement Company time in respect to McDonald's debt, and McDonald & Co. time as to their creditors. Upon the evidence, Henry A. Rogers took his note in extinguishment of a debt due from McDonald & Co. The defendant Kenefick gave a receipt which shows that he took his note in full payment of the debt of McDonald & Co. "when said note is paid." This seems to imply an extension of time. The Rogers Locomotive Company took its note as collateral to the note of McDonald & Co. dated the same day, February 25,

1896, and running six months. This also seems to imply the giving of time. As to the Ætna Powder Company and the Eppinger & Russell Company, very little appears in the evidence as to the terms upon which they took their notes. McDonald testified that he offered them these notes, and they took them. Whether merely as collateral or in extinguishment of their claim does not appear. So far as these notes were taken in absolute payment or extinguishment of the previous debt, or upon a contemporaneous agreement, express or implied, giving time, it appears that they were taken for value. Mayer v. Heidelbach, 123 N. Y. 339, 25 N. E. 416, 9 L. R. A. 850; Insurance Co. v. Church, 81 N. Y. 218. So far as they were taken merely as collateral, or merely credited on a pre-existing debt, and without extinguishing the debt or extending time of payment, they seem to be not taken for value. Same cases. But it is not necessary in this case to determine whether McDonald & Co. and their creditors who took these notes are holders for value. These parties were brought in, upon the motion of the West India Improvement Company, as necessary or proper parties for the purpose of determining the issues between it and the Manhattan Trust Company, in order that, if any relief should be awarded to the West India Improvement Company against the Manhattan Trust Company, such relief might be given as would be consistent with the rights of the beneficiaries under the Manhattan Trust Company's mortgage, and as between the plaintiff and the Manhattan Trust Company the title of the Manhattan Trust Company must prevail if any of its beneficiaries were holders of said notes for value without notice; and some of them unquestionably were. It is unimportant, in respect to the issues between those two parties, what may be rights of others of the persons claiming to be beneficiaries of the Manhattan Trust Company under that mortgage. In case the Manhattan Trust Company should foreclose its mortgage, or sell the securities, the plaintiff in this action would have a right to intervene by proper proceedings to assert the superiority of its equity against that of the beneficiaries under the Manhattan Trust Company mortgage. Although, in the answer of the Manhattan Trust Company, relief is prayed for ascertaining the rights of all persons interested in the security held by it, and the distribution of its proceeds, yet such relief seems not to be within the scope of this action, nor are all the parties who have a right to be heard on that question parties. Mr. Brice, the Ætna Powder Company, and the Rogers Locomotive Company are not parties; and, except so far as it is necessary for the determination of this action, it would seem that the rights of the parties in a proper proceeding for distribution of the fund should not be prejudged, and in such proceeding the evidence as affecting the rights of the note holders may be different. It appears also that the plaintiff holds, as mortgagee, valuable lands in Jamaica,—a circumstance which may affect the equities of the parties upon a distribution of the fund. The whole amount of notes issued and claimed to be held for value under this hypothecation to the Manhattan Trust Company is $762,600.98, and this includes about $150,000 in dispute between the West India Improvement Company and McDonald & Co. Another note for $237,399.02 was made, and is still held by the West India Improvement Company, but it is not claimed that any rights were ever acquired under it. No relief is asked by the plaintiff as regards the £30,000 of first mortgage bonds. They are not within the jurisdiction of the court, and neither party has shown any legal title in them. The West India Improvement Company may never acquire them. As regards the stock and the second mortgage bonds mentioned in the complaint, in respect to which alone relief is asked, the defendant shows the better title.

The answer of the Manhattan Trust Company alleges that the notes of the West India Improvement Company, and each and every one of the same, were duly issued and delivered for value to the various individuals or firms, and that the said notes, and each and every one of the same, now remain unpaid, and are now, and at the time of the commencement of this action were, outstanding in the hands of bona fide holders for value. I think this averment is proved with regard to some of the notes,—those held by Samuel Thomas, the Chase National Bank, and the Manhattan Trust Company itself; and the defendant the Manhattan Trust Company is entitled to judgment dismissing the complaint, with costs. I think the West India Improvement Company should

not recover costs, as the hypothecation of these securities to the Manhattan Trust Company was in violation of the terms of its prior mortgage to the plaintiff. The judgment should also declare that the claim or cause of action alleged by the West India Improvement Company against the Manhattan Trust Company and the other defendants, Samuel Thomas, the Chase National Bank, the Southern Trust Company, Henry A. Rogers, James P. McDonald, Alfred Bishop Mason, and James Irvine, composing the firm of James P. McDonald & Co., the Eppinger & Russell Company, and William Kenefick, Jr., be dismissed, with costs to the said several defendants the Manhattan Trust Company and others, together with their disbursements incurred in the defense against said claim or cause of action as against the West India Improvement Company; defendants appearing by the same attorneys, however, to recover only one bill of costs.

Argued before VAN BRUNT, P. J., and McLAUGHLIN, PATTERSON, O'BRIEN, and INGRAHAM, JJ.

David Willcox and Adrian H. Joline, for appellant Central Trust Co.

Samuel H. Guggenheimer, for appellant West India Imp. Co.

Willard Parker Butler and Eugene Treadwell, for respondents.

PER CURIAM. The judgment should be affirmed, with costs, on the decision of the referee.

INGRAHAM, J. I am unable to concur in the affirmance of this judgment. The mortgage by the West India Company to the plaintiff recites that the mortgagor is the owner of "a certain grant and concession for the purchase, maintenance, and operation of the existing railways in the island of Jamaica, and for the construction, maintenance, and operation of certain extensions thereto, and of other rights, powers, privileges, franchises, and liberties" thereto appertaining, and that for the purpose of carrying out the said objects of its formation, and for the full enjoyment of such grant and concession, and for the purpose of exercising all the rights, powers, privileges, and franchises, and liberties contained in the said grant and concession the mortgagor was desirous of borrowing the sum of $1,000,000, to be secured by a first mortgage or deed of trust given by the said mortgagor to the plaintiff "upon all its said franchises and concessions, and upon all other property, real and personal, rights, privileges, franchises, and liberties so as aforesaid acquired by it, or hereafter to be acquired by it, or to which it shall be lawfully entitled in conformity with the provisions of the said the Jamaica Railway Company's law"; and of conveying to the plaintiff, to secure the payment of the sum of money mentioned, "all the grants and concessions for the purchase, maintenance, and operation of the existing railroads in the island of Jamaica, and for the construction, maintenance, and operations of certain extensions thereto, * * * and all railways, rights of way, leaseholds, leases, agreements, and contracts now owned or hereafter to be acquired or owned by said party of the first part by virtue of said concessions, when and as the same shall be so acquired and owned; and also the common capital stock of the Jamaica Railway Company, of the par value of one million pounds sterling, a corporation to be organized and formed under and in pursuance of the provisions of said act of the legislative council of

Jamaica, known as the 'Jamaica Railway Company's Law of 1889' (a, copy of which said act is hereto annexed, marked 'Schedule B'), as the said common capital stock shall be received by the party of the first part pursuant to said act; and also all other property, or rights of property, real, personal, or mixed, now held and acquired, or which the party of the first part may hereafter hold, acquire, or be entitled to, in, for, upon, by reason of, or in connection with the purchase, construction, maintenance, or operation of said railway, or under or in pursuance of the provisions of said act, or any of the grants, concessions, rights, privileges, franchises, or liberties thereby conferred." When this mortgage was executed, the mortgagor held a concession for the construction of a railroad in the island of Jamaica, by the terms of which, upon the construction of said road, it would become entitled to the shares of stock and the second mortgage bonds, the right to which is the subject of controversy ·in this action. This right arose because of the ownership of this concession under the government of the island of Jamaica. A transfer of the concession in-volved a transfer of the right to receive these stocks and bonds, and by the mortgage of the concession, with the stock and bonds when received, there was acquired by the plaintiff a lien upon the concession and the incidents or property which would flow from it. And thus, I think, the mortgage, as executed, conveyed to the mortgagee, not an agreement to give a lien upon future-acquired property, but a present lien on this concession and on the right to receive the stocks and bonds, which, under the concession and the Jamaica Railway Company's law, were to be executed and delivered to the mortgagor. The mortgage or pledge of the concession gave to the mortgagee a specific lien upon the stock and bonds, to which the mortgagor became entitled, under the concession, as soon as the mortgagor became entitled to such stock and bonds. Thus, when these stocks and bonds were delivered to the mortgagor, they became, in his hands, subject to the mortgage, and the plaintiff's lien upon them became complete. In my view, it was not an agreement to give a mortgage upon these securities when received, but a lien upon the right to receive them was created by the mortgage of the concession, and that lien followed that right until the right was consummated by the delivery of the securities to the mortgagor; and the plaintiff had the right to resort to a court of equity to enforce that lien in the hands of whomsoever those securities would be when the obligations to secure which the mortgage was given became due.

By the third clause of the mortgage provision was made for a sale of the property covered thereby, with the consent of the plaintiff, but it was provided that in no case should any such sale "or any other disposition of said property be made without the express written assent thereto of the trustee [plaintiff], evidenced by said trustee joining in every such sale, conveyance, or transfer." It was then provided that, "until default shall be made in the payment of the principal or interest of the bonds hereby secured, or some of them, * * * and until the failure and omission on the part of the company to keep and perform the covenants by this indenture undertaken and agreed on its part to be kept and performed, or

some of them, the company shall be suffered and permitted to hold, possess, control, manage, operate, and enjoy all the hereinbefore described property, real and personal, grants, concessions, rights, powers, franchises, and liberties, with the appurtenances thereunto belonging, and to receive and use the income, rents, issues, profits, and emoluments thereof in the same manner and to the same extent and effect as if this deed had not been made." Taking these provisions together, I can see no escape from the conclusion that the right of the mortgagor to dispose of this property, or make any sale or transfer of it, depended upon the written assent of the trustee; and, in the absence of such a consent, the property was to remain in the possession of the mortgagor, subject to the lien of the mortgage, until the payment by the mortgagor of the obligations to secure which the mortgage was given. The mortgagor received the stock, and was entitled to receive the second mortgage bonds; but the right accrued to it under the concession upon which the plaintiff had a lien, the possession of which the mortgagor was to retain so long as the covenants and conditions of the mortgage were fulfilled. Such stock and bonds became subject to the lien of the mortgage when received by the mortgagor, as the right to receive such stock and bonds had been expressly mortgaged to the plaintiff. I take it that any transfer of this concession or right to receive these stocks and bonds by the mortgagor to a third party, whether for a valuable consideration or not, would have been subject to the right of the plaintiff under this mortgage; and when the mortgagor had received these stocks and bonds by virtue of the concession, the transfer of the stock and bonds to third parties would have been as much subject to the plaintiff's mortgage as would a transfer of the right to receive the stock and bonds if it had been transferred before their receipt. Thus, I think the transfer of these stocks and bonds to the defendant the Manhattan Trust Company under the agreement of September 3, 1896, was subject to the prior lien in favor of the plaintiff.

This agreement with the Manhattan Trust Company was dated September 3, 1896. The notes were issued and the money paid by Thomas on September 18th, by the Chase National Bank on September 17th, and by the Manhattan Trust Company on September 21st. At that time none of the stocks and bonds had been actually delivered to the Manhattan Trust Company. All that the trust company had was an agreement by this mortgagor to deliver certain shares of stock and bonds to the trust company, with the delivery of the certificates and a formal transfer in writing of such stocks and bonds. The legal title to these stocks and bonds was still in the mortgagor. On the 26th of October 1896, after these notes had been actually discounted and the money paid for them, the legal title to the shares of stock was transferred to the Manhattan Trust Company, and certificates thereof in its name delivered to it, "and the said £100,000 second mortgage bonds were surrendered by the colonial secretary of Jamaica, and were made payable to bearer, and delivered to the defendant the Manhattan Trust Company." The referee found that by the law of the colony of

Jamaica the legal title to the capital stock of the Jamaica Railway Company, as between the West India Improvement Company and the Manhattan Trust Company, could pass only by a deed of transfer, and did not pass by the delivery of certificates standing in the name of the West India Improvement Company, with a transfer thereon in blank, and indorsed thereon, and signed by it. None of those who had advanced money upon the faith of this transfer to the Manhattan Trust Company actually advanced such money upon the faith of the actual transfer of the legal title of the stock and bonds to the trust company, but entirely upon the promise of the mortgagor to so transfer such stock and bonds. It seems to me that the title that the Manhattan Trust Company obtained to this stock and the bonds was subordinate to and subject to the lien of the plaintiff, which had attached, and which the plaintiff is entitled to enforce; and that, "as between different assignees of a chose in action by express assignment from the same person, the one prior in point of time will be protected, although he has given no notice of such assignment to either the subsequent assignee or the debtor." Fortunato v. Patten, 147 N. Y. 283, 41 N. E. 572; Fairbanks v. Sargent, 104 N. Y. 108, 9 N. E. 870; Williams v. Ingersoll, 89 N. Y. 508. It is for these reasons that I think the authorities relied on by the learned referee to sustain his conclusion that this mortgage is merely a right in equity to have this after-acquired property supplied as security to the mortgage do not apply, and that the principle stated by the supreme court of the United States in the case of Judson v. Corcoran, 17 How. 612, 15 L. Ed. 331, is not applicable, as the plaintiff's lien upon this stock and bonds had become absolute, and could only be devested by a release of the mortgagee, or the payment of the obligations to secure which the mortgage was given.

As my associates do not agree with me in my view of the rights of these parties, but concur with that of the referee for the reasons given by him, this statement of the reasons of my dissent is sufficient.